Schillinger vs. The Town of Verona.

SCHILLINGER, Respondent, vs. THE TOWN OF VERONA, Appellant.

*May 27 — June 21, 1893.*

*Highways and bridges: Injury caused by defects: Sufficiency of special verdict: New trial.*

1. Plaintiff was injured while attempting to drive across a bridge by his horses becoming frightened at a hole therein, not within the traveled track, and backing the buggy off the bridge and down the unprotected embankment of the approach thereto. In a special verdict the jury answered in the negative the question, "Was the hole in the bridge an insufficiency or want of repair of the bridge naturally calculated to frighten horses of ordinary gentleness?" The jury were not instructed that the hole might constitute an insufficiency or want of repair though not so large or so connected with the traveled track that horses were liable to step in or upon it and thereby become frightened. There were no findings as to the size of the hole, or how the horses became frightened at it, or where they were with reference to it when they became frightened. An order granting a new trial on the ground that the verdict was defective is *held* not to have been clearly based on a misapprehension of law, since the trial court might properly have held that the above question was misleading and the answer thereto defective.

2. The jury were instructed that plaintiff could not recover if the horses remained beyond his control long enough for him to have regained control by ordinary care and skill before the buggy went over the embankment. They found that the horses became more than momentarily unmanageable, but there was no finding as to how far they backed down the approach to the bridge before the buggy went over the embankment. There was an admitted defect in the highway only one foot from the end of the bridge, in that the road was there five inches lower than the surface of the bridge, and the buggy must have come in contact with this defect before it went over the embankment and after the horses had backed but a few feet. *Held*, that in this respect also the trial court was warranted in holding the verdict defective.

WINSLOW, J., dissents.

APPEAL from the Circuit Court for *Dane* County.

This action is to recover damages for personal injuries sustained by the plaintiff while attempting to drive over a

85  589
87  359

85  589
88  319

85  589
89   48
89  208
89  671

85  589
92  143

85  589
s96  460

85  589
99  365

85  589
109  576

85      589
112    ¹200

bridge across Sugar river in the defendant town, July 20, 1890. The complaint is in the ordinary form, and among other things alleges, in effect, that at the time there was a hole in the bridge, constituting an insufficiency or want of repair; that the embankment constituting the approach to the north end of the bridge was too narrow, insufficient, and without railings or guards; and that plaintiff's team became frightened at the hole, and backed off from such embankment, and caused the injury. The answer consisted of denials, and alleged contributory negligence.

At the close of the trial the jury returned a special verdict to the effect that (1) the hole in the bridge was not an insufficiency or want of repair of the bridge at the time of the accident, naturally calculated to frighten horses of ordinary gentleness; (2) that the horses at the time in question were ordinarily gentle horses; (3) that the horses did become frightened at the hole in the bridge at the time in question; (4) that, if the hole was an insufficiency or want of repair naturally calculated to frighten horses of ordinary gentleness, then the defendant did not have actual notice thereof; (6) that the highway forming the approach to the north end of the bridge was in a condition of insufficiency or in want of repair; (7) but such insufficiency or want of repair was not the proximate cause of the accident and injury suffered by the plaintiff; (8) that the team, while in the plaintiff's charge at the time of the accident, did become unmanageable; (9) and more than momentarily unmanageable; (10) that the plaintiff, at the time of the accident, was not guilty of any want of ordinary care in driving and managing his team which directly contributed to produce the injury complained of; (11) that, if the plaintiff was entitled to recover, his damages were assessed at $400.

The court at first directed judgment to be entered on said special verdict in favor of the defendant, and the same was entered accordingly May 23, 1892. The plaintiff moved,

Schillinger vs. The Town of Verona.

at the same term, on the minutes of the judge, to vacate the judgment, to set aside the verdict, and for a new trial upon the exceptions to the special verdict, and upon the inconsistencies of the answers to the questions of the special verdict, and because the verdict was contrary to law and evidence, and the judgment inconsistent with the verdict. Upon hearing of said motion by the court it was " ordered and adjudged that the judgment for the defendant in said matter, entered May 23, 1892, be and hereby is vacated; that the verdict herein be and hereby is set aside *upon the ground that* the special verdict in the case is *inconsistent* and *defective;* and that a new trial in the above-entitled action be and hereby is granted to the plaintiff *on that ground.*" From that order the defendant appeals.

For the appellant there were briefs by *Olin & Butler*, and oral argument by *J. M. Olin*.

For the respondent there was a brief by *La Follette, Harper, Roe & Zimmerman*, and oral argument by *G. E. Roe*.

CASSODAY, J. The highway at the place in question ran north and south across the Sugar river. The bridge over the river was eighty-six feet long, sixteen feet wide, and nine and one-half feet above the water. The planks were three inches thick and sixteen feet long, and the bridge was fourteen and one-half feet wide between the railings. The hole mentioned in the foregoing statement appears to have been formed by a large knot in the north edge of the thirty-third plank from the north end of the bridge having become loosened and knocked out, and then a sliver broken off from that plank, tapering from the place where the knot had been west until it came to a point; and which knothole appears to have been about three feet from the east railing, and the point mentioned appears to have reached to or nearly to the usual wheel track on the east

side of the bridge. The witnesses who attempted to describe the hole seem to agree that it was the largest at the east end, where the knot had been, and that it gradually tapered to a point at the west end of it; but they differ considerably as to the size of the hole. The testimony as to the size of the hole seems to range from two to four inches wide, and from six to twenty-four inches long, and the verdict leaves the size of the hole otherwise undetermined.

The approach up to the north end of the bridge was upon an embankment in the form of an inclined plane, built of stumps piled in and covered with dirt. The face of this embankment was very much narrower than the bridge. An architect and engineer who took the measurements, testified to the effect that, where that embankment joined the bridge it was only ten feet wide, and that it was three and one-half feet from the east end of the plank to the embankment, and two and one-half feet from the west end of the plank to the embankment; that there was no railing along the east side of the embankment; that from the top of the embankment to the bottom on that side, perpendicularly, one foot from the bridge, it was seven feet and three inches; that three feet from the bridge it was seven feet and five inches; that seven feet from the bridge it was six feet and three inches; that ten feet from the bridge it was five feet and four inches; that one foot from the bridge the face of the embankment clear across was five inches lower than the surface of the bridge. Some of the witnesses give a somewhat different description of the embankment, and one, who seems to have measured it, said it was twelve feet wide close up to the bridge.

The plaintiff testified, in effect, that on the afternoon of July 20, 1890, he, with his wife, got into a two-seated carriage or buggy, with springs under each end, but with only one seat in at the time, drawn by a span of horses, and

drove south upon the highway in question, and up the embankment mentioned, and onto the bridge described, with the reins in both hands; that the horses went nicely until their heads were at or near the hole in the bridge mentioned; when they began to shy, and jumped to the left side as far as they could, and in the same moment, and as quick as they could, they went back; that as soon as they jumped he took the reins in his left hand, and told them to "get up," and reached with his right hand for the whip, but could not catch it; that "it went like lightning;" that his wife screamed and hallooed; that as the horses went back the right hind wheel went off the plank first; that when that went down the other left wheel had to go down; that a little further, and then the buggy, horses, and everything, including himself and wife, went down the east side of the embankment described, when the plaintiff became unconscious.   The horses thereupon appear to have started north with the carriage for about twelve rods, when they broke loose from it, and continued to run north until they were stopped.   The man who stopped them took them back to the bridge, and he testified to the appearances at the bridge, to the effect that he found the plaintiff near the bridge; that he saw where the buggy had been dragged from the foot of the embankment to the place where it lay; that he saw the footprints of the horses on the edge of the embankment, about half way from the top to the bottom, and about six or seven feet from the north end of the bridge; that he saw a few pieces of short boards and a broken whip at the foot of the embankment, about six feet north of the north end of the bridge; that he saw what appeared to be wheel marks on the top of the embankment; that such wheel marks left the bridge about six or eight inches east of the west wheel track, and ran in a semicircle or curve towards the east edge of the embankment; that such wheel marks or tracks appeared to have been

made by the two off wheels of the buggy, and were not more than seven feet from the north end of the bridge; that he did not see any track or mark made by either of the near wheels; that there were two tracks there at that time, but they were apparently made by the two off wheels; that he saw no tracks to match, made by the near wheels. If this version of the occurrence is correct, then it is manifest that the near hind wheel must have gone over the embankment about the time the fore wheels left the bridge; certainly before the horses left the bridge.

A witness on the part of the defendant testified to the effect that he saw the plaintiff from a distance when he drove onto the bridge; that when he got a little ways onto it his horses backed up and turned right square off, and went up the road; that it looked to him, from the distance, as though they backed perhaps to the edge of the embankment, got their hind feet off, and then turned and went up the road; that upon going to the bridge he saw a track where the buggy backed off the embankment; that the near front wheel had been cramped so hard that it had partly slid; that the buggy, and particularly the hind wheels, appeared to have gone down the embankment very nearly square; that the left fore wheel had been cramped,— had been partly sliding,— so that it shoved the dirt up, and made a very plain track; that the footprints of the horses were at the edge of the embankment, but that there were no tracks from there down in the mud; that he saw prints in the mud, as though something had fallen down the embankment and packed down the mud, and that that was somewhere from twenty-five to thirty feet north of the north end of the bridge. If this version of the occurrence is correct, then it would seem that the buggy did not turn and go over the embankment until it reached a point twenty-five or thirty feet north of the north end of the bridge.

Other witnesses give different versions as to the distance from the north end of the bridge to the place where the buggy apparently went over the embankment. The question is left wholly undetermined by the special verdict. So the distance from the north end of the bridge to the hole in the bridge mentioned is left undetermined by the special verdict. Several of the witnesses put it about thirty feet.

Such are the general outlines of the evidence upon which the special verdict is based. The several findings of the jury constituting that verdict are, in effect, given in the foregoing statement. As there indicated, the trial court set aside that verdict and granted a new trial on the ground that it was "inconsistent and defective."

The rule is firmly settled by repeated decisions that the granting of a new trial is very much in the discretion of the trial court, and that its order granting the same will not be reversed unless there clearly appears to have been an abuse of such discretion. *McLimans v. Lancaster*, 57 Wis. 297; *Seaman v. Burnham*, 57 Wis. 568; *Evans v. Rugee*, 63 Wis. 31; *Smith v. Champagne*, 72 Wis. 480; *Schraer v. Stefan*, 80 Wis. 653. The only exception to this rule is where it affirmatively appears upon the record that such order was based upon a misapprehension of the law. *Smith v. Dragert*, 61 Wis. 223; *Mullen v. Reinig*, 68 Wis. 410; *Warner v. Michelstetter*, 77 Wis. 674.

The question recurs whether such misapprehension of the law does affirmatively appear in this record. One of the grounds upon which the order was granted is that the findings of the jury are inconsistent. Counsel for the defendant claims that the court erroneously held that the first three findings were inconsistent. He contends that, although the plaintiff's horses were at the time ordinarily gentle and did become frightened at the hole in the bridge, yet that such hole at the time might not have been an insufficiency or want of repair naturally calculated to frighten

horses of ordinary gentleness; in other words, horses of ordinary gentleness may become frightened at an object not constituting an insufficiency or want of repair in the highway naturally calculated to frighten such horses. This may be conceded. *Olson v. Chippewa Falls*, 71 Wis. 558; *Pittsburgh S. R. Co. v. Taylor*, 104 Pa. St. 306; *Cleveland, C., C. & I. R. Co. v. Wynant*, 114 Ind. 525, 5 Am. St. Rep. 644. But another ground upon which the order was granted is that the verdict was defective. The first question submitted to the jury reads: "Was the hole in the bridge an *insufficiency or a want of repair of the bridge*, at the time of the accident, naturally calculated to frighten horses of ordinary gentleness?" To answer that question in the affirmative it became necessary for the jury to find, not only that the hole was an object naturally calculated to frighten horses of ordinary gentleness, but also that it was an insufficiency or a want of repair of the bridge; in other words, it comprised a mixed question of law and fact. Thus, in *Foshay v. Glen Haven*, 25 Wis. 288, the trial court charged the jury *as a matter of law* "that an object existing within the limits of the highway, but leaving the traveled path unobstructed, so that the traveler is safe from collision with it, *is not an insufficiency in the way* merely because it exposes the traveler's horse to become frightened at the sight of it, and the town in such case would not be liable;" but this court reversed the judgment by reason of such error, and held *as a matter of law* that "objects within the limits of a highway, naturally calculated to frighten horses of ordinary gentleness, may constitute such defects in the way as to render the town liable, *even though so far removed from the traveled path as to avoid all danger of collision.*" *Bloor v. Delafield*, 69 Wis. 273. This principle of law was nowhere given to the jury in charge, nor was it requested. The court read to the jury the statute giving damages "by reason of the insufficiency or want of repair

of any bridge," etc. (sec. 1339, R. S.), and charged them "that this statute had given a remedy against towns where injury results by reason of such *insufficiency or want of repair;*" and then submitted to them the mixed question of law and fact quoted. The jury may have thought, as the trial judge did in *Foshay v. Glen Haven*, 25 Wis. 288, that there could be no insufficiency or *want of repair in the bridge, within the meaning of the statute, unless the hole was so large and so connected with the traveled track that horses were liable to step in or upon it, and thereby to become frightened. It is entirely a matter of conjecture whether the horses did step in or upon the hole and become frightened therefrom, or whether they became frightened by seeing the water glimmer through the hole. These things might depend upon the size of the hole and the place where the horses were with reference to it when they began to shy and jump,— questions, as we have seen, left undetermined by the verdict. May not the trial judge, in making the order, have reached the conclusion that in the absence of more specific instructions upon the principle of law mentioned the jury wrongly determined the legal proposition embraced in the question? And if he did so conclude, was it not within the province of his discretion to set aside the verdict on that ground? Was not the trial court justified in holding that the question as submitted was misleading, and the answer to the same defective? We cannot say that it appears affirmatively upon the record, in the particulars mentioned, that the order setting aside the verdict was based upon a misapprehension of the law.

By the eighth and ninth findings the jury found, in effect, that at the time of the accident the team became more than momentarily unmanageable. Upon this question the court charged the jury that, "if  .  .  .  the horses became unmanageable and uncontrollable, and remained beyond the control of the plaintiff a length of time

sufficient to regain control by ordinary care and skill on his part *before he was thrown out of the buggy*, then he· cannot recover in this case." Under this instruction the conclusion of the jury was necessarily based upon the plaintiff's testimony as to the conduct of the team, the distance of the hole from the north end of the bridge, the nearness of the horses' heads to the hole when they first became frightened, the length of the carriage and team when taken together, the fact whether the carriage went over the embankment within seven feet of the end of the bridge as indicated by portions of the evidence, or twenty-five or thirty feet north of the bridge as indicated by other portions of the evidence, or at some intermediate point as indicated by still other portions of the evidence. In other words, this particular finding is in effect a general verdict upon this branch of the case. The question recurs whether it affirmatively appears upon the record that this order setting aside such a finding as defective is necessarily based upon a misapprehension of the law applicable. Manifestly it was based very largely, if not wholly, upon the view which the trial judge took of such disputed and undetermined facts. Besides, the finding is not limited to the time when the carriage came in contact with the defective embankment. On the contrary, the portion of the charge quoted extended the question of such unmanageableness down to the time when the plaintiff " was thrown out of the buggy;" that is to say, when it went over the embankment. It is to be remembered that the court answered the sixth question to the effect that the approach to the north end of the bridge was insufficient or in want of repair. As indicated, it was much narrower than the bridge, and only ten feet wide; it was three and one-half feet from the east end of the plank to the embankment, and with no railing on that side; and one foot from the bridge the face of the embankment clear across was five

inches lower than the surface of the bridge. Thus it appears that when the hind wheels of the carriage struck the embankment they at once came in contact with an admitted defect in the highway. If the carriage and horses together were eighteen feet in length, and the horses were frightened by seeing the glimmer of the water through the hole, which, according to some of the witnesses, they might have done when their heads were three or four feet from it, then it is manifest that they only had to back eleven or twelve feet before the carriage came in contact with the defect. If their heads were right over the hole at the time they became frightened, then it would seem that they only had to back some fifteen feet before the carriage came in contact with the defect. True, the carriage and horses, taken together, may not have been as long as mentioned; but, in any view of the evidence, it would seem that the horses could not have backed more than from eleven to eighteen feet before the carriage came in contact with an admitted defect in the highway.

The question recurs whether the jury should have been limited to that period in determining whether the team became more than momentarily unmanageable, or whether that question was properly left unlimited, and by the charge of the court expressly extended to the time when the plaintiff was thrown out of the buggy. The rule seems to be pretty firmly established " that a horse is not to be considered uncontrollable that merely shies or starts or is momentarily not controlled by his driver." *Houfe v. Fulton*, 29 Wis. 306; *Titus v. Northbridge*, 97 Mass. 258; *Ring v. Cohoes*, 77 N. Y. 87. So, in *Babson v. Rockport*, 101 Mass. 93, it was held " that if there was only a momentary loss of control, and the control would have been instantly regained *if the plaintiff's carriage had not come in contact with the place where the way was defective*, then the plaintiff could recover." To the same effect, *Stone v. Hubbardston*,

Schillinger vs. The Town of Verona.

100 Mass. 49; *Cushing v. Bedford*, 125 Mass. 526; *Wright v. Templeton*, 132 Mass. 49. This last case was somewhat similar to the case at bar, and it was "held that the defendant had no ground of exception to the submission to the jury of the question whether the plaintiff's loss of control over the horse was momentary only, with an instruction that if the horse backed sixty feet or more the plaintiff could not recover." *Olson v. Chippewa Falls*, 71 Wis. 558, is quite similar to the last case cited.

In our judgment, the trial court was warranted in holding that the ninth question as submitted was defective. Certainly it does not affirmatively appear upon the record that the order setting it aside was based upon a misapprehension of the law. Of course, the manner of submitting that question had a controlling influence upon the jury in their answer to the seventh question submitted.

WINSLOW, J. I dissent herein because it seems to me that the special verdict is a consistent and complete verdict, which disposes of all the issues in the action. I shall not elaborate my views, but will simply say that after considerable examination and thought I find myself unable to perceive the defects in the verdict which the court finds to exist. To my mind, it tells a plain and perfectly consistent tale, all the facts of which are supported by sufficient evidence; and it seems to me that under the law laid down in *Jackson v. Bellevieu*, 30 Wis. 250, the defendant is entitled to judgment upon the verdict.

*By the Court.*— The order of the circuit court is affirmed.