## RUSSELL TITUS *vs.* INHABITANTS OF NORTHBRIDGE.

When a horse, while being driven with due care upon a highway which a town is bound to
keep in repair, becomes, by reason of fright, disease or viciousness, actually uncontrolla-
ble, so that his driver cannot stop him or direct his course, or exercise or regain control
over his movements, and in this condition comes upon a defect in the highway, by which
an injury is occasioned, the town is not liable for the injury, unless it appears that it would
have occurred if the horse had not been so uncontrollable. But a horse is not to be con-
sidered uncontrollable in this sense, if he merely shies or starts or is momentarily not
controlled by his driver.

TORT for injuries alleged to have been caused to the plaintiff
and his wife and his horse and wagon by reason of a defect in
a highway in Northbridge. The damages were laid in the sum
of five thousand dollars.

At the trial in the superior court, before *Putnam, J.*, it ap-
peared in evidence that on the afternoon of April 12, 1866, the
plaintiff with his wife was driving carefully, in an open wagon
drawn by one horse, at a speed of not more than six miles per
hour, over a road in Northbridge which it was the defendants'
duty to keep in repair; that at a point about seventy feet from
the place of the accident there was a low wall on the left hand
side of the road as the plaintiff was travelling, and the way was
wrought for travel about twenty feet wide, and the grade of it
was slightly descending; that at this point the horse, notwith-
standing the plaintiff's effort with the reins to keep him in the
travelled track, (the left hand rut of which was about three feet

distant from the wall,) bore off towards the wall, and finally stopped with his fore legs and the nigh wheels of the wagon resting against it; that the plaintiff immediately started the horse again and pulled on the right rein, meaning to guide him into the ruts of the road; that the horse at first obeyed, and turned for a short distance towards the travelled track, but before getting fully into it "suddenly ceased to obey the rein, became unmanageable and uncontrollable, bore to the left hand side in spite of all the plaintiff could do to stop him, and, after continuing on in this way from sixty-five to seventy feet, went over a bank wall on the left hand side, where the injury complained of was received, the plaintiff doing all he could to control him up to the point of his going over the bank."

It appeared that the bank was about four feet high and eighty feet long, and was without any railing and had been so for more than twenty-four hours; that the top of it was about a foot below the level of the travelled track; that from the bottom of it the land sloped off abruptly for several feet; and that the outer face of the bank wall was the limit of the highway. There was also testimony that on the right hand side of the road as the plaintiff was travelling lay a pile of lumber, the distance between which and the outer edge of the bank wall was only about sixteen feet.

There was evidence showing that the plaintiff used due care in managing the horse at the time of the accident; and he offered evidence tending to show that the horse was a safe one, free from any vicious habits or any known or previously mani- fested disease, except that he had been occasionally known to shy a little but never to such an extent as to become unmanage- able; that he was tender bitted and easily controlled, and was frequently driven by women and young persons; and that the wagon was safe and every way suitable.

The defendants offered evidence tending to show that a sud- den attack of a disease called megrims, being a nervous disorder affecting the brain of horses, rendering them unconscious and uncontrollable by the rein for the time being, and causing them sometimes to bear off blindly out of their proper course, and

often coming on suddenly without any previous indication, **rendered** this horse uncontrollable at this time. There was also evidence tending to show that he had never before been attacked by this disease, and had never exhibited any symptoms of it before or since the accident; that it was not the result of any disease to which he was known to be subject.

Upon this evidence, the defendants asked the judge to rule that the action could not be sustained; which the judge declined to do. The defendants then asked him to instruct the jury as follows: " 1. that if at a point in the highway where the same was safe and convenient, with a travelled way wrought for travel of suitable and ordinary width, the plaintiff's horse, either from a propensity to shy, or from some sudden fit or other sickness of like nature, passed out of the part of the road so prepared and used for travel, against the wall, and, on the plaintiff's attempting to start him forward, under the influence of the same cause became uncontrollable, and in spite of the plaintiff's attempts to turn him again into the travelled path bore off to the left of the same, and continued out of the same for seventy feet, and then passed over an embankment near the side of the road, there being for the whole distance a way of sufficient width for the horse to pass securely and without accident but for such cause, into which the plaintiff might easily have turned him had he been controllable, and the injury was thereby caused, the plaintiff cannot recover, although the way was defective for want of a railing at the point where the horse actually went off the road ; 2. that upon the evidence the plaintiff cannot recover; 3. that if the plaintiff's horse in passing along the highway had the megrims, which came upon him in a place in the highway where the same was safe, and rendered him dizzy and uncontrollable, and by reason of said disease he lost his consciousness and power of obedience to the rein and bore off blindly out of the travelled way for a distance of seventy feet, and then passed over the bank which rendered the way unsafe, and the horse would not have so turned from the way, or gone over the bank, but for said disease, the defendants are not liable ; 4. that if the fault of the horse in shying contributed to the accident, although

the horse had manifested the same propensity before in a slight degree only, the defendants are not liable , 5. that if the condition of the horse and the direction in which he was going were such as to satisfy the jury that the accident would have happened if the embankment had been so far from the travelled way that the way would have been beyond question ordinarily and reasonably safe, the plaintiff cannot recover ; or, 6. that if the accident would have happened even if there had been a railing of sufficient and reasonable height and strength for all ordinary purposes of travel, the plaintiff cannot recover."

The judge gave the fourth and sixth instructions asked, and upon the points generally embraced in the defendant's prayer instructed as follows : " That if the horse had any vicious habits which operated on the occasion of the accident in question, and did in fact contribute to it, the plaintiff could not recover; and that a habit of shying might be a vicious habit, (instructing them under what circumstances it would be a vice;) but that if the horse had no vicious habits which operated on this occasion, but was, in all respects, a proper horse for the plaintiff to drive, and was rendered unmanageable by some sudden illness likely to happen to such animals in the ordinary course of events and which common prudence and sagacity on the part of the plaintiff could not have provided against, and the plaintiff used all proper care, under the circumstances, in guiding and controlling the horse at the time, he might recover, provided the jury should find that the way was defective by want of a railing, and that the accident would not have been likely to have happened had there been a proper railing there."

The jury returned a verdict for the plaintiff and assessed damages in the sum of two hundred and fifty-four dollars and seventeen cents ; and the defendants alleged exceptions.

*G. F. Hoar*, for the defendants.    To render a town liable for an injury from a defect in the highway, it must have been the sole cause of injury.    This is the true legal effect of an averment that the injury was caused by reason of the defect. *Adams* v. *Carlisle*, 21 Pick. 146.    *May* v. *Princeton*, 11 Met. 442.    The town is responsible only for direct and immediate loss so occa-

sioned. If damage arises from a more remote cause, or from any efficient concurring cause without which it would not have happened, the town is not responsible. *Marble* v. *Worcester*, 4 Gray, 402. The ruling at the trial was inconsistent with this principle, and, under it, what was the sole efficient cause of the accident has never been determined as a question either of law or of fact, for the judge required the jury to find, not that the defect caused the injury, but only that it would not have been likely to happen but for the defect.

Where all the facts and their relation to the injury are found, the question what is the sole efficient cause, in the legal intent of the phrase, is a question of law. *Marble* v. *Worcester*, 4 Gray, 395, and cases there cited. On the facts disclosed the want of a railing was not, in any legal or practical use of the phrase, the cause of the injury. The natural and ordinary way of accounting for such an accident would be to say that it was caused by the horse having a fit. The blind violence of the animal in the fit was the supervening and proximate cause. *Davis* v. *Dudley*, 4 Allen, 557. The jury, in the nature of things, could not know what a frantic horse might have done, and therefore could not know that the accident would not have occurred if the road had not been defective. The case of *Murdock* v. *Warwick*, 4 Gray, 178, cannot in principle be distinguished from this. The decision in that was not on the ground that the vice of the horse indicated want of due care in the driver, but on the ground that it is essential to a recovery that the defect in the way should be the sole cause of the injury. The reason why a vice in the horse contributing to the disaster prevents recovery is because it implies present unsuitableness for the use for which he is designed, and thereby creates a condition of things against which the town is not bound to guard. Towns are not bound to construct their ways so that a horse may have a fit therein with perfect safety to the driver.

The reasoning in *Davis* v. *Dudley*, *ubi supra*, is applicable to this case. There is no valid distinction between a case where long before the defect is reached the animal is freed from the control of his driver by distance or breaking of the tackle, and

a case where long before the defect is reached the driver's power of control is gone from any other cause. And further, it is settled that the defendants would not be liable if the accident occurred in part through causes originating out of the limits of the highway. *Rowell* v. *Lowell*, 7 Gray, 100. *Richards* v. *Enfield*, 13 Gray, 344. It is impossible to say where the illness of the plaintiff's horse, which first manifested itself in the highway, may have begun.

The present case differs from *Palmer* v. *Andover*, 2 Cush. 600, in three particulars, and the defendants have no need to ask the court to reconsider that decision. First, in that case the only operating cause between the original pure accident and the injury which resulted from the defect in the way, was the natural law of gravitation, the results of which could be accurately calculated; but here was an operating cause in the shape of an animal will, the effects of which could not be calculated, and it is therefore impossible to say that this accident would not have happened but for the defect in the way. Second, in that case the original accident was one happening in the course of and in consequence of the use of the vehicle in the highway, being such an accident as towns are bound to expect and guard against in constructing their roads; but here it was not the result of the use of the animal in the way, but of a latent disorder which might have developed itself anywhere. Third, this case also differs from that, in the fact that here the horse left the travelled track at a point where it was safe and walled, and never got into it again before he went over the bank.

The defendants' fifth prayer should have been granted, for under the ruling refusing it the jury were permitted to find for the plaintiff even if they should be of opinion that the accident would have happened if the way had not been defective. The defect here complained of was not, strictly speaking, the want of a railing, but the vicinity of the bank to the travel. The jury were permitted to find that the plaintiff might recover even if the bank were so far distant from the travel as to make the road reasonably safe without a railing.

*H. B. Staples & C. G. Keyes*, for the plaintiff. Under the in-

structions given, the jury must have found that the plaintiff was using due care up to the time he went over the bank; that the shying of the horse did not contribute to the injury; that the road at the bank was without a sufficient railing; and that the injury would have been prevented by such a railing. The only objection which can now be made to the plaintiff's right to recover is that the blind violence of the horse arising from sudden illness, which was not the result of any known or previously manifested disease of the beast, and could not have been foreseen or provided against by ordinary prudence and sagacity, may have coöperated with the defect in the road in producing the injury.

The case is within the principle of *Palmer* v. *Andover*, 2 Cush. 600, that where a pure accident manifestly combines with the defect in producing the injury the town is liable. The phrase " pure accident" means an unexpected event happening without the fault of the plaintiff or the unlawful or careless acts of third persons, and contributing immediately to the injury. Such an accident may often impel or carry a traveller, without his fault, out of the travelled part of the road, and the town still be liable. *Bigelow* v. *Rutland*, 4 Cush. 247. *Alger* v. *Lowell*, 3 Allen, 402. *Lund* v. *Tyngsborough*, 11 Cush. 563. *Goldthwait* v. *East Bridgewater*, 5 Gray, 61. *Stevens* v. *Boxford*, 10 Allen, 25. The sudden illness which rendered the horse uncontrollable for the time being was as much a pure accident as was the loosening of the nut and detachment of the horses, thereby rendering the carriage uncontrollable, in *Palmer* v. *Andover, ubi supra.* Can there be a distinction between a cause which renders the carriage uncontrollable and one which renders the horse uncontrollable ?

The case is distinguishable from *Davis* v. *Dudley*, 4 Allen, 557 ; first, because here the plaintiff exercised due care and controlled his horse so far as possible up to the very moment of the injury ; second, because the sudden illness of the horse was the only accident which happened and was not the result of any prior accident ; and third, because, though this accident was the primary cause of the injury, yet it was an active operating cause

up to the moment the wagon went over the bank, and combined with the defect in producing the injury.

CHAPMAN, J. It appears that the plaintiff's horse became diseased while travelling on the highway, and thereby became unmanageable. He ceased to obey the rein; bore to the left hand in spite of all the plaintiff could do to stop him, and after continuing on in this way for sixty-five or seventy feet, went over a bank wall on the left side of the road, where it was defective for want of a railing, and thus occasioned the injury complained of.

The case is substantially like that of *Davis* v. *Dudley*, 4 Allen, 557, where the court remarked that the injury was occasioned by " the blind violence of the animal, acting without guidance or discretion." It is true that, in that case, the horse had broken loose from the sleigh, and had left it and the driver at some distance behind him when he came upon the defect and received the injury. But the driver's control over the horse was as effectually lost in this case as in that; and in both cases the action of the horse, after he became uncontrollable, occasioned the injury.

And this case is unlike that of *Palmer* v. *Andover*, 2 Cush. 600; for in that case, after the horses broke loose from the carriage, they ran away and did no injury, and if the place where they left the carriage had been ascending ground, the carriage would have remained where it was, and no injury would have happened to the passengers. But the bolt was drawn out at a place where the carriage was going down hill, and the natural laws of gravitation and motion carried it to the place where the road was defective. It is not inconsistent with the decision in that case, as explained and limited in *Rowell* v. *Lowell*, 7 Gray, 100, and in *Davis* v. *Dudley*, to hold that the defendants are not liable for an injury occasioned, as this has been, by the action of a horse that was at the time of the accident unfit for use, and was beyond the driver's control, although the defect in the highway was also a cause of the injury.

The court are of opinion that when a horse, by reason of fright, disease or viciousness, becomes actually uncontrollable,

so that his driver cannot stop him, or direct his course, or exercise or regain control over his movements, and in this condition comes upon a defect in the highway, or upon a place which is defective for want of a railing, by which an injury is occasioned, the town is not liable for the injury, unless it appears that it would have occurred if the horse had not been so uncontrollable. But a horse is not to be considered uncontrollable that merely shies or starts, or is momentarily not controlled by his driver. *Exceptions sustained.**

---

* A similar decision was rendered in the following case argued at October term 1867 for Bristol.