ADELIA BABSON *vs.* INHABITANTS OF ROCKPORT.
JOSEPH E. HARTWELL *vs.* SAME.

On the trial of an action against a town for injuries alleged to have been caused to a traveller by a defect in the highway on which he was driving with a horse and carriage, the jury were instructed that, for the plaintiff to recover, the defect must have been the sole cause of the accident which resulted in the injury; that if the plaintiff's horse became uncontrollable, and was so when the accident occurred, the plaintiff could not recover; but that if there was only a momentary loss of control, and the control would have been instantly regained if the plaintiff's carriage had not come in contact with the place where the way was defective, then the plaintiff could recover. *Held*, that these instructions were correct.

A. and B. were driving a horse drawing a carriage, on a highway which a town was bound to keep in repair. A. had alighted from the carriage, leaving the reins with B., when the horse began to back. A. seized his bridle, but could not stop him, and he backed the carriage with B. in it, and pulled A., over a bank by the side of the road, at a place where the way was defective for want of a railing. *Held*, that if the carriage had gone so far over the bank as to be beyond the control of the horse before the horse had got beyond the control of A. and B., they could recover against the town for damages so sustained by them.

Two ACTIONS OF TORT to recover for injuries alleged to have been caused to the plaintiffs by reason of a defect in a highway in Rockport; tried together before *Foster*, J., and by him reported substantially as follows:

The plaintiffs started for a drive from Rockport to Gloucester, in a carriage drawn by one horse, on August 22, 1867, and on the way met with the accident which caused the injuries in question.

It appeared from evidence put in by the plaintiffs, and from a plan, also introduced in evidence, that the part of the highway at which the accident occurred ran for forty or fifty feet along the side of an excavation, which was at the point of the accident nine feet deep; that the side of the highway towards this excavation was built up of stone, forming a bank wall, and along the top of this wall were placed cap-stones, forming a barrier or stone fence to protect travel; that at the point where the accident occurred, a portion of this barrier of stone had fallen out of place, leaving a gap six feet in width, through which the plaintiffs' carriage went over the bank wall; that the top

stone had been off the wall more than twenty-four hours, and the selectmen of the town had notice of the defect; that the highway along this place descended in grade moderately, or about eight feet in fifty, measuring from the highest part, the point of accident being about midway of the descent; that the travelled part of the highway was from twenty-one to twenty-two feet wide, and the inclination from the centre to the wall from twelve to thirteen inches, the space between the travelled track and the wall from two to four feet, and the wall two feet thick. The defendants were bound to keep the highway in repair.

The plaintiff Hartwell testified as follows: "Miss Babson drew my attention to a hole in the roadway, and told me to put something in it to make it safe for travel. After passing by some distance, I turned and drove back, and just before we came to the hole I passed Miss Babson the reins and got out. I sat on the left side. I walked a very few steps to the left towards the gutter, to get a stone, and saw my horse backing. I made a spring to catch him, and caught him by the bridle. In a second all was over. The horse was backing when I caught his head. In backing, he turned his head to the right. The carriage went over backwards off the wall, and I struck on my feet at the bottom of the precipice. I got out nearly opposite the gap in the wall. The hole in the road was a little beyond the gap. The rut was from two to three feet from the wall. There was nothing to obstruct my right off-hind wheel. There were holes this side of the main wall, among small loose stones which lay between the off-rut and the wall. I saw my wheel go into a low place where the stones were. The horse's head inclined to the right off-side in backing. I think the off-wheel went off first. When I turned back I meant to keep on after putting a stone into the hole."

On cross-examination he testified: "I had been over the road before occasionally. I had passed the place of accident five or six rods when I turned. The hole in the road was from six to ten feet towards Rockport from the gap in the wall. I saw it a few feet before we got to the gap in the wall on the

eft of where the horses travel; between that and the wheel rut. I drove by it till I came to a good place to turn round, then I turned and travelled back up the hill. The gap in the wall was now on the right of the road, the side Miss Babson sat on. The horse was not stopped at all. I jumped out before we came to this hole in the road, the horse continuing in motion on a slow walk. I stepped to the left toward the gutter, and was about opposite the horse's head — to the left, on the side I sat. I did not go out of the travelled way, nor in front of the horse's head. The horse began to back just as I got opposite his head; probably he had not backed more than one step when I seized him. Miss Babson did not say anything nor exclaim. I seized the bit very quickly. The horse kept backing and pulling, turning his head away from me and backing quite furiously after I seized hold. I had a firm hold, and nothing gave way, and I exerted all my strength to prevent the backing. The horse was too much for me, uncontrollable by me. I had nothing in my hand. Before he began backing, I may have been half a foot or half a step in advance of the horse, but I made no motion, nor did anything to alarm him. He was not a horse that would back at any one approaching his head. I hung on till the horse went off the wall. While doing this, I said nothing to Miss Babson, nor she to me. I did not see how the reins were after I put them into her hands. I recollect nothing that she said to me. Nothing but seeing the horse back led me to seize the head-stall. Nothing in the way of backing suggested any cause of alarm. The horse was perfectly gentle, and never backed before. Miss Babson had driven him, and well. I didn't know whether Miss Babson reined in the horse or whether he backed voluntarily. The horse was furiously backing after I seized hold. It was more than I could do to manage and draw him forward. In backing, the wagon was thrown at right angles to the horse. Everything was so quick, one couldn't form much of an idea of it except for a second. If there had been room enough, and the horse had continued pulling and backing, the carriage would have described a circle. I think I held to the bridle till the last second. I don't think my hands left the bridle at all. I had hold when I went over."

On reëxamination he said : " It was not more than a second after I took hold by the horse's head before I went over." On re-cross-examination : " The rut was near the edge of the travelled part of the way, about three feet from the wall; the wheel was in the rut when I seized the bridle."

The plaintiff Babson testified as follows : " I noticed a cavity in the road; after passing it, I asked Mr. Hartwell to turn round and fill it, but at first he thought it of no consequence; I insisted, and after driving to the foot of the hill, he turned. After turning, I noticed flies on the horse. Near the place, Mr. Hartwell passed me the reins and jumped out. The horse turned his head to the right, and the check-rein sort of looped and caught in the shafts on the right hand side. At the same moment I saw I was going backwards, and a motion of the carriage as if tipping back. Mr. Hartwell's hand, I then noticed, was on the rein. Then I screamed. I remember no more; it was all instantaneous. My attention was never before called to this place in the wall."

On cross-examination she testified : " I held the reins in my hands when I noticed the horse backing, and I believe I lifted the reins loosely when the horse began to back, intending to slap with them, but I did not pull at any time. If I did anything, it was to urge the horse forward. The horse was walking leisurely as Mr. Hartwell jumped out, as any horse goes up hill, and he continued in motion. I know Mr. Hartwell wasn't beyond the horse's head; he was about one and a half yards from it when the horse turned it. The horse was then in motion. He threw his head round, and the check-rein caught on the shaft. The check-rein looped down, as it would naturally when the horse turned his head, and the part that looped caught on the shaft. The check-rein was fastened upon the water hook. I can't tell what part of the check-rein caught on the shaft. The horse threw his head towards the wall, away from Mr. Hartwell, and then, in an instant, backed. When I felt myself tip backwards Mr. Hartwell grasped the bits of the horse. I don't think the horse took more than one or two steps; can't say how many. I think that, when Mr. Hartwell seized hold, the

hind feet of the horse were over the wall, and the horse threw him over. I am certain the hind wheels were off, and I think all four were off when Mr. Hartwell seized the horse by the head. Nothing had been said when we turned as to changing our route."

Evidence was also introduced on the part of the plaintiffs tending to show that the horse was perfectly kind and gentle, and easy for any one to manage; that he would stand without hitching, and had no habit of backing nor any vicious habit whatever; that he was a fast traveller, but easily governed; and that the harness was suitable and strong.

This was all the material evidence in the case. The defendants offered no evidence, and asked the presiding judge to rule that the actions could not be sustained. But the judge declined so to rule, and instructed the jury (besides other instructions not objected to) as follows :

"It is necessary, in order to enable the plaintiffs to recover, that the defect in the highway should have been the sole cause of the accident, no other cause contributing thereto. If before the accident the horse, from any cause, became actually uncontrollable, and was so when the accident occurred, the plaintiffs cannot recover. But if there was only a momentary loss of control, and the control of the animal would have been instantly regained if the vehicle had not come in contact with the defect in the way, then the plaintiffs may recover. The jury must be satisfied that the animal did not practically pass beyond the control of the plaintiffs, except for an instant, and that control would have been immediately regained but for the coming into contact with the defect."

The jury returned verdicts for both the plaintiffs, and the question of the liability of the defendants in the actions, or either of them, was reserved for the consideration of the whole court.

*T. H. Sweetser & B. H. Smith*, for the defendants. To maintain these actions, it must be proved affirmatively that the injuries were caused solely by reason of the defect, no other cause contributing thereto. *Murdock* v. *Warwick*, 4 Gray, 178.

*Marble* v. *Worcester*, Ib. 402.  *Davis* v. *Dudley*, 4 Allen, 557
*Titus* v. *Northbridge*, 97 Mass. 258.  *Horton* v. *Taunton*, Ib. 266.
*Fogg* v. *Nahant*, 98 Mass. 578.  *Moore* v. *Abbot*, 32 Maine,
46.  *Moulton* v. *Sanford*, 51 Maine, 127.  *Knapp* v. *Salsbury*, 2
Camp. 500.  *Titus* v. *Northbridge* differs from this case.  This
was no case of shying, starting, involuntary action on the part
of an animal over whose movements his driver still retained
substantial guidance, but one in which the horse threw off all
control, and in this condition came upon the place where the
way was defective, and the injury was caused.  If control of a
horse, on account of his vicious conduct, is absolutely lost, even
if only for an instant, and at this instant he comes upon a de-
fective place in the highway, by which an injury is caused, no
action can be maintained, because, in that instant, all the con-
ditions of a result produced by independent, coöperating causes
are fulfilled.  Whether or not control of the animal would have
been immediately regained but for this coming in contact with
the defective place was immaterial.  The plaintiff Hartwell was
not a traveller.  *Richards* v. *Enfield*, 13 Gray, 344.  *Stickney*
v. *Salem*, 3 Allen, 374.

*S. J. Thomas & I. S. Morse*, for the plaintiffs.

CHAPMAN, C. J.  In order to render a town or city liable on
account of an accident happening on a highway, it must hap-
pen to a traveller, and the defect of the way must be the sole
cause of the injury.  *Rowell* v. *Lowell*, 7 Gray, 100.  *Stickney*
v. *Salem*, 3 Allen, 374.  If a horse gets loose and runs upon the
highway, the town is not liable.  *Richards* v. *Enfield*, 13 Gray,
344.  In *Davis* v. *Dudley*, 4 Allen, 557, this principle was ap-
plied to a case where the horse escaped from his driver while
travelling on the way.  In *Titus* v. *Northbridge*, 97 Mass. 258,
and *Horton* v. *Taunton*, Ib. 266, it was applied to cases where
the horse had not escaped from the driver, but had got entirely
beyond his control.  In those cases there was no evidence suffi-
cient in law to establish the fact that the driver was exercising
any control over his horse, or that the defect in the highway was
the sole cause of the injury.

It is the duty of the court to decide such cases as presenting

merely a question of law upon the sufficiency of the evidence in law to authorize a verdict for the plaintiff. But the circumstances under which accidents occur must vary indefinitely; and where a case arises in which there is some substantial evidence upon which it would be competent to find a verdict for the plaintiff, a question of fact is presented which is to be submitted to the jury. In all the cases cited, this distinction has been kept in view. From the nature of the case, it must often require a very careful analysis of the evidence to decide whether it raises a question of fact for the jury or a question of law for the court.

In the present case there was some evidence for the plaintiffs sufficient to authorize the presiding judge to submit it to the jury. He did so with careful and accurate instructions in respect to the law. Upon a comparison of the testimony of Miss Babson with the plan which was in evidence, the court cannot see that the carriage had not got so far off the road and over the bank as to be beyond the control of the horse before she and Hartwell lost control of him, and that a proper railing would not have prevented the accident.

The decision of the case depends upon a considerable number of circumstances, and the inferences of fact which are to be drawn from them. *Exceptions overruled.*