RITGER, Administratrix, Appellant, vs. THE CITY OF MIL-
WAUKEE and others, Respondents.

*March 2 — April 12, 1898.*

*Municipal corporations: Liability for obstructions in street: Runaway
horse: Contributory negligence of driver: Proximate cause.*

1. The contributory negligence of the driver of a private conveyance
   in which another person is voluntarily riding at the time of his
   injury is imputable to the person so injured, and will prevent a
   recovery by him for the injury sustained.
2. There can be no recovery against a town or city for injuries caused
   by a runaway or uncontrollable horse.
3. Where, in an action for an injury received by reason of an obstruc-
   tion in a street, the evidence shows that the injury was sustained
   while plaintiff's horse was running away, such running away must
   be deemed the proximate cause of the injury.
4. Where, in such action, the evidence was clear that the driver had
   more than momentarily lost control of the horse at the time of the
   injury, and there was no evidence which could sustain a verdict
   in favor of the plaintiff, a nonsuit was properly granted.

APPEAL from a judgment of the circuit court for Milwau-
kee county: D. H. JOHNSON, Circuit Judge. *Affirmed.*

Action brought by the plaintiff, the widow of John Rit-
ger, deceased, and administratrix of his estate, against the
defendants, to recover damages for injuries alleged to have
been received by her husband, John Ritger, on the 6th of
July, 1895, caused by the negligence of the defendants, and
from the effects of which he died.

On and prior to the time in question the Milwaukee Street
Railway Company, managed by the defendants *Henry C.
Payne* and *George R. Sheldon* as receivers, was operating
an electric railway line along the center of Walnut street,
at its intersection with Lisbon avenue and Twenty-Fourth
street; and it appeared that center poles for the support of
wires were placed along the center of Walnut street; that
the defendant the city of *Milwaukee* authorized by ordi-
nance the placing of said center poles in the center of Wal-

Ritger vs. The City of Milwaukee and others.

nut street, but not within street crossings; that the city of *Milwaukee* permitted the placing, and the street railway company, by its receivers, placed and maintained, a center pole in the center of Walnut street, and within six and two-tenths feet of the center of Lisbon avenue, at the intersection of Lisbon avenue, Walnut street, and Twenty-Fourth street, and upon the east line of Twenty-Fourth street; that said center pole was within the crossing, and at the center of the crossing, of Lisbon avenue and Walnut street, and it was claimed that the same was a dangerous obstruction and nuisance to the traveled part of Walnut street and Lisbon avenue, and a nuisance to persons traveling on said streets.

It was charged that said center pole was knowingly, unlawfully, and negligently supported and maintained by the defendants in said place for more than two years prior to July 6, 1895, and that on the night of that day John Ritger, plaintiff's husband, when lawfully and carefully driving along Lisbon avenue, at 12 o'clock at night, was, without fault or negligence on his part, thrown against said center pole by reason of the left wheel of the wagon striking violently against said pole, which was so obstructing the traveled part of the crossings of said streets, whereby he received injuries which caused his death.

The answer of the receivers admitted the location and intersection of the streets, and the location of the center poles, except that the one in question was in the center of the crossing at the intersection of Lisbon avenue and Walnut street. The answer alleged ignorance of the death of Ritger, and averred that his injuries and death were the result of his own negligence.

The answer of the defendant city admitted the location and maintenance of the public streets mentioned in the complaint, and its obligation to keep them in reasonable repair and free from obstruction, and admitted the passage of the ordinance authorizing the street railway company to equip

its lines with electric power, but denied that the center pole described in the complaint was placed at the intersection of Walnut street, Lisbon avenue, and Twenty-Fourth street with the knowledge of the defendant city, and alleged a want of knowledge of any obstruction being in those streets as alleged. It also alleged that Ritger at the time of his injury was riding along said street in a wagon drawn by one horse, and driven by a man unknown to the defendant, and that the horse and wagon were driven in a careless and reckless manner, which contributed to and caused the injuries of said Ritger; and it averred that, if there was any negligence in placing said pole at said point of intersection, it was the fault and negligence of the street railway company, and that said receivers were therefore primarily liable for all damages on account of the injuries complained of.

The issues came on for trial before the court and jury. At the close of the testimony on the part of the plaintiff the defendant city moved for a nonsuit, for the reason that it was not shown that the city was in any way liable for the accident, or had contributed to it, and for the further reason that the driver was guilty of negligence which contributed to the injury. The motion for nonsuit was granted; the defendant receivers having joined in the motion. It is conceded that the circuit court, in granting the defendants' motion for nonsuit, assumed that the center post, C, might be considered a dangerous obstruction, for the trial court said: "There has been evidence tending to show that this [meaning the center pole, C] may be dangerous to horses passing along over the avenue or the street at that crossing. There is evidence tending to show that a more judicious distribution of the posts would be less dangerous. So, upon that question, I have come to the conclusion to submit it to the jury whether or not, under the circumstances of the case, and of the crossings here, the post was an obstruction to the safe use of the street." It is therefore plain that had

it not been for the view that the court took of the other
branch of the case, namely, in regard to the condition of the
horse at the time of the injury, the issues would have been
submitted to the jury for a verdict, and that the case was
withdrawn from the jury simply and solely on the ground
that the horse, at the time the buggy collided with the center
post, was running away, and had wholly passed beyond the
control of the driver, and proceeded on its way until the
vehicle encountered the center pole.

Referring to this question, the trial judge states, as shown
by the record: "All the evidence tends to show that at that
point where the electric light was hung the horse became
frightened and became unmanageable, and the driver again
and again states that he lost all control of him at that point.
He dashed with more or less speed eastward, and ran his
buggy against the post. The plaintiff was thrown out and
killed, or so grievously injured that he died some eighteen
days later. Is this the case of a horse and driver, the horse
becoming frightened and unmanageable, and the driver los-
ing control of him, and subsequently, in the course of the
flying horse's career, an obstruction is struck, and injury re-
sults? Or is it the case where the horse becomes *momenta-
rily* frightened, and does not become a runaway horse, and,
as a result of the fright, encounters an obstruction in the
highway, to the injury of the driver, or the person accom-
panying the driver? Upon the view I have taken of the
facts in this case, I will consider it the case of a *runaway*
horse escaping entirely from the driver, and proceeding on
its way until he encounters an obstruction in the highway."
Counsel for the appellant concedes that, had it not been for
the view which the court took in regard to the condition of
the horse at the time of the injury, there is no doubt the
question as to whether the post was a dangerous obstruc-
tion would have been submitted to the jury for decision.

The testimony of Otto Neuman, plaintiff's witness, shows

that he and the plaintiff's intestate, Ritger, both residents of Milwaukee, were riding along Lisbon avenue on the night of July 6, 1895, with a horse and buggy belonging to Neuman, who was driving. They had been to a meeting at the Shooting Park, on Third street, the deceased riding there and back with Neuman. They went there about 8 o'clock p. m. This was about five miles from the scene of the accident, in another part of the city. Neuman was thirty-four years old, and had known Ritger for six months prior to the injury. On their return from the park they drove down Third street, then out on North avenue, stopping at one or two places, and then, when they came to Lisbon avenue, turned in and drove southeast on Libson avenue until they came to the intersection of Lisbon avenue and Walnut street, *where the horse was frightened by the electric light, and ran against the pole,* C, both Neuman and deceased being thrown out, and the horse, freed from the buggy, ran away. Ritger struck against the trolley post, C, and received injuries from which he died.

Neuman testified, that when he drove in on Lisbon avenue, it was after 10 o'clock, and he drove down as far as Twenty-Fourth street. "*There my horse got scared, and made a jump, and started to run.* This was right *on the corner of Lisbon avenue and Walnut street.* I was intending to go down Walnut street, east. My horse seemed to get frightened at the electric light. It kind of flickered, and he jumped to the left, and the left front wheel struck the center trolley post. [It was admitted that the post, C, designated on the plat, was the one he struck.] When the wheel struck the post, we both flew out of the buggy. I landed on the ground, straight, and he flew against the trolley post, striking on the head. The horse run away, and I flew like this over the dashboard. *I couldn't hold him, and the horse run off.* The striking broke the left front wheel, and the crosspiece in the thill. That was all. Ritger was

Ritger vs. The City of Milwaukee and others.

carried into a doctor's office, and taken to the hospital.    As
we came down Lisbon avenue, Ritger was sitting on the
left-hand side of the buggy.    I was driving, and *was trying
to hold the horse* when the pole was struck.    I said, ' Whoa,
Tom ! ' but *all at once he struck the post, before I was able to
stop him.*    I was accustomed to handling horses at that time.
I was driving southeast on Lisbon avenue, on the right-hand
side, going toward Walnut.    When I came along where the
electric light was, I was driving *on an ordinary trot;* was on
the north side of that light, which hangs at the corner of
Twenty-Fourth and Walnut streets.    When my horse got
scared I was right under that lamp in the center of the
street, but on the right-hand side of Lisbon avenue when I
was coming this way.    I wanted to go down Walnut street,
but I didn't commence turning before I got to the lamp.
When I got to the light, my horse turned to the left.    I in-
tended to go around on Walnut street, and to do that I had
to turn to the left.    It was shortly before I got to Twenty-
Fourth street that I intended to turn east on Walnut.    I
had decided before I came to that lamp — probably a second
before — to go down Walnut when I got *about under the
lamp;* and *at* the time I came to the lamp *I had my horse
under control, at an ordinary trot,* and after I came to the
lamp I went *at an ordinary trot.*    Q. You went right
along in an ordinary trot until you trotted to the post?
A. *No, sir; then the horse made a jump and tried to run.*
Q. How was he going then?    A. *Then he was going faster,*
*when he was scared.*    Q. *Was he running away?*    A. *Yes,
sir.*    Q. *Out of your control?*    A. *Yes, sir.*    Q. You couldn't
handle him?    A. *No, sir.*    Q. How fast was he going when
he struck the post?    A. I couldn't say.    Q. How fast?
A. *Pretty fast.*    Q. On a good run?    A. *Yes, sir.*    Q. *You
had lost all control of him at the time he came to the post?*
A. *Yes, sir.*    Q. Did you see that post when you got to the
lamp?    A. Yes, sir.    I don't remember on what point west

Ritger vs. The City of Milwaukee and others.

of Twenty-Fourth street I struck Lisbon avenue. It was several blocks west of Twenty-Fourth street. I guess, about half a mile. Was driving east on Lisbon avenue when this happened. Just about the time when I got to the crossing of Walnut street and Twenty-Fourth street, I made up my mind I wanted to go east on Walnut, instead of on Lisbon. I have had twenty years' experience in driving a horse, and know how to handle a horse. Q. If you could have handled that horse at the time, could you have missed that post? A. *I couldn't handle him in a short distance.* Q. If you had him under control, could you have missed it? A. *I couldn't hold him.* Q. Suppose he had not run away, *if you had him under control,* would you have missed the pole? Was there room enough to drive by if the horse would not run away? A. Yes, sir."

After the court had nonsuited the plaintiff, she moved for a new trial; but her motion was overruled, and judgment entered in favor of the defendants for costs, from which the plaintiff appealed.

*Orren T. Williams,* for the appellant, argued, among other things, that the trolley post against which the wagon in which plaintiff's intestate struck was a dangerous obstruction in the street, and that the horse was not running away until after the collision, but was simply momentarily unmanageable, and the facts should have been submitted to the jury. *Thoresen v. La Crosse City R. Co.* 87 Wis. 605; *Little v. Superior R. T. R. Co.* 88 id. 406; *Vallin v. M. & N. R. Co.* 82 id. 5; *Hill v. Fond du Lac,* 56 id. 242; *Barstow v. Berlin,* 34 id. 361; *Draper v. Ironton,* 42 id. 697; *King v. Oshkosh,* 75 id. 518; *Sheffield v. Cent. U. Tel. Co.* 36 Fed. Rep. 165; *Wolfe v. Erie T. & T. Co.* 33 id. 320.

For the respondent city of *Milwaukee* there was a brief by *Howard Van Wyck,* city attorney, and *A. B. May,* assistant city attorney, and oral argument by *Mr. May.*

For the other respondents there was a brief by *Miller, Noyes, Miller & Wahl,* and oral argument by *Geo. P. Miller.*

PINNEY, J.   When the plaintiff's intestate, Ritger, entered Neuman's private conveyance to ride with him, he made such conveyance, for the time being, his own, and assumed the risk of the skill and care of Neuman, the person driving it, whom he thereby made his agent for that purpose.   The contributory negligence of Neuman, the driver of the private conveyance in which Ritger was voluntarily riding at the time he received the injury which resulted in his death, is imputable to Ritger, so as to prevent a recovery by the plaintiff, as his administratrix, in this action.  · *Prideaux v. Mineral Point,* 43 Wis. 513; *Otis v. Janesville,* 47 Wis. 422.

The uncontradicted evidence is clear and decisive to show that the horse attached to the buggy, and driven by Neuman, in which he and the plaintiff's intestate were riding, became frightened, but not by reason of any defect in the street, so that he became more than momentarily uncontrollable, and ran away, whereby he ran against the center post in the street, and the plaintiff's intestate was thrown out of the vehicle, receiving the injuries which caused his death. It has been repeatedly held that there can be no recovery against the town or city in consequence of injuries sustained by reason of a runaway or uncontrollable horse.   *Jackson v. Bellevieu,* 30 Wis. 250; *Bishop v. Belle City St. R. Co.* 92 Wis. 139; *Schillinger v. Verona,* 96 Wis. 456.   In the recent case of *McFarlane v. Sullivan, post,* p. 361, the subject was elaborately considered, with copious citations of authorities.   The evidence is uncontradicted, clear, and decisive that the proximate cause of the injury which resulted in the death of the plaintiff's intestate was that the horse attached to the vehicle in which he was so riding had wholly passed beyond and escaped from the control of the driver, and ran away, so that the vehicle collided with the center pole, and Ritger thereby received fatal injuries.   While it is alleged that the proximate cause of his death was the negligent acts and omissions of the defendants, the evidence

Ritger vs. The City of Milwaukee and others.

clearly shows that another adequate and independent cause intervened between the alleged negligence and the injury, and became the proximate cause of it.

It is beyond dispute that the primary cause of the injury, and which led, by regular sequence, to the death of Ritger, was the more than momentary escape of the horse from the control of the driver. This was the thing amiss, by reason of which the vehicle collided with the center post, with the result stated. The evidence does not show that the loss of control of the horse was merely momentary or accidental, or one which would have been at once regained if the vehicle had not come in contact with the center pole. It was not a case where the horse swerved quickly to one side, and the driver might readily have brought him to his proper position and course, but it was unmistakably the case of a runaway. The testimony of the driver is positive and emphatic, and against it there is no evidence from which any inference to the contrary can be fairly drawn. The driver's evidence is to the effect that it was after 10 o'clock at night; that they drove in on Lisbon avenue down to Twenty-Fourth street. " There my horse got scared, and made a jump, and started to run. This was right on the corner of Lisbon avenue and Walnut street. I was intending to go down Walnut street, east. My horse seemed to get frightened at the electric light. It kind of flickered, and he jumped to the left, and the left front wheel struck the center trolley post. When the wheel struck the post, we both flew out of the buggy. I landed on the ground, straight; and he flew against the trolley post, striking on the head." " The horse ran away. I couldn't hold him. . . . As we came down Lisbon avenue Ritger was sitting on the left-hand side of the buggy. I was driving, and was *trying to hold the horse* when the pole was struck. I said, ' Whoa, Tom!' but all at once he struck the post, before I was able to stop him." He further testified that when he came to the lamp he "had his

horse under control, and was going at an ordinary trot."
"Then the horse made a jump and tried to run." "Then
he was going faster when he got scared." The witness af-
firmed that the horse was running away; was out of his
control; that he couldn't handle him; that when he struck
the post "he was on a good run, and he had lost all control
of him." "At the instant when the buggy struck the post,
I was trying to hold the horse, saying, 'Whoa, Tom!' and
hanging onto the lines, and I couldn't hold him any more."
He expressed the opinion that he could have stopped the
horse within 100 or 200 feet from the place where he was
frightened, if he had not struck the post, and said he could
not handle him in a short distance. His opinion was at best
a mere conjecture, and does not appear to be supported by
the attending facts and circumstances, which all clearly
tend to show that the horse was more than momentarily
uncontrollable. As against the positive statement of the
witness Neuman, to the effect that the horse was running
away and was beyond his control, and that this was a con-
dition of more than momentary duration, no mere conjec-
ture or inference, not sustained by competent and quite
satisfactory evidence, could suffice to take the case to the
jury.

It is stated in *Titus v. Northbridge*, 97 Mass. 258, that
"when a horse, by reason of fright, disease, or viciousness,
becomes actually uncontrollable, so that his driver cannot
stop him or direct his course, or exercise or regain control
over his movements, and in this condition comes upon a de-
fect in the highway, by which an injury is occasioned, the
town is not liable for the injury, unless it appears that it
would have occurred if the horse had not been so uncon-
trollable." In such case it is considered that the conduct of
the horse is the primary cause of the accident; that there
are two efficient, independent, proximate causes,— the pri-
mary cause being one for which the corporation is not liable,

Ritger vs. The City of Milwaukee and others.

and as to which the driver himself is in no fault, and the other being a defect in the highway; hence it is impossible to determine that the accident would have happened but for the primary cause. Municipalities "are under no duty to provide for everything that may happen in the street, but only for such things as ordinarily exist, or may reasonably be expected to occur," and hence are not bound to so care for the streets that damage may not be caused thereon by horses which have escaped from the control of their driver and run away. Dillon, Mun. Corp. § 1015.

As was said in *Scannal v. Cambridge*, 163 Mass. 93: "It is difficult to discover any evidence on which the jury could find that this [Neuman's] loss of control of the horse was only momentary. If it was something more than a momentary accidental loss of control, which ought not to be treated as an independent, contributing cause of the injury, and was a permanent or long-continuing condition, the plaintiff would be precluded from recovery, even if the way were defective." In that case the plaintiff testified that he "had no more control of the horse than a baby would have; that he tried to pull the horse in, and to steer him out into the street again, but he couldn't do it." In the present case the driver had quite as little control over the horse, which was actually running away, and when the fact of inability to control, or readily to regain control of, the horse appears, the rule applies. It is not essential that this condition shall exist, if once established, during any definite period, or that the horse shall run any prescribed distance. Whether the case should have been submitted to the jury involved, upon the undisputed facts, a mere question of law, namely, whether the case, upon all the evidence, was open to any fair inference that the driver lost control of the horse more than momentarily. Against his clear statement of existing facts, we are unable to say, upon all the evidence, that any inference could be fairly drawn upon which a verdict for the

plaintiff could be properly supported.  We think that the
nonsuit was properly granted.

*By the Court.*— The judgment of the circuit court ·is af-
firmed.