EHLEITER, Administrator, Respondent, vs. CITY OF MILWAUKEE, Appellant.

*February 27—March 22, 1904.*

*Highways: Injuries from defects: "Momentary" loss of control of horse: Appeal: Changing special verdict: New trial.*

1. A horse which, after shying at an electric car, ran sixty feet or more along the street in spite of the driver's efforts to stop him, is *held*, as matter of law, to have been more than "momentarily uncontrolled," within the meaning of that expression as used in the rules of law respecting liability of municipalities for injuries caused by defects in their highways.

2. Where the trial court erred in refusing to change the answer to a question in a special verdict, this court on appeal may direct that such change be made and judgment rendered accordingly, without a new trial.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed.*

Action for damages by death of Michael Hart, caused by a defect in highway, under following circumstances: Between 3 and 4 o'clock a. m. of April 7, 1901, Hart was driving a reasonably quiet horse in front of a buggy containing himself, wife, and daughter, southward on Kinnickinnic avenue, toward a point where a swing bridge crossed the Kinnickinnic river, with which he was entirely familiar,.

having driven over same daily for many months. The bridge had been open, undergoing repairs, for perhaps an hour. There was no barrier, and the only signal was a red light on top of the bridge, instead of a white one, which indicated that the bridge was open. Decedent drove at a trot—whether rapid or moderate is in conflict—until he reached a point about ninety feet north of the bridge, where an electric motor car was stationary, or nearly so, whereupon, according to the testimony of plaintiff's witnesses, the horse shied at the car and started forward in a run, which was continued until he plunged into the river. A watchman stationed to guard the bridge rushed into the street about twenty-seven feet north of the bridge and shouted warning, which, however, had no effect. Other witnesses testify that the horse was not frightened, but continued a rapid trot from some 250 feet north directly down to the bridge. Those who testify that the horse was running away also testify that the deceased was exerting every effort to stop him but was unable to do so. The jury found, by special verdict: (1) Inadequacy of guard to the bridge; (2) which was the proximate cause of the injury; (3) that the horse, at and immediately prior to being driven into the river, was beyond decedent's control; (4) that he was no more than momentarily uncontrollable; (5) that decedent could not, by the exercise of ordinary care, have known that the bridge was open; and (6) that he was not guilty of any want of ordinary care. At the close of the trial, defendant moved to set aside and reverse the answers to each of these questions, which motions were all overruled, and judgment rendered for the plaintiff, from which the defendant appeals.

For the appellant there was a brief by *Carl Runge,* city attorney, and *Thos. H. Dorr,* special assistant, of counsel, and oral argument by *Mr. Dorr.*

For the respondent there was a brief by *Toohey & Gilmore,* and oral argument by *J. L. Gilmore.*

DODGE, J.   Upon the trial of this case two sharply conflicting theories were presented and supported by evidence: First, that the decedent drove more or less rapidly toward the bridge, with his horse under control, until he reached or passed the watchman, and was then unable to stop before going into the river, upon which theory it was claimed he was guilty of contributory negligence, under the rule laid down in *Stephani v. Manitowoc,* 101 Wis. 59, 76 N. W. 1110; secondly, it was contended by the plaintiff that before reaching the bridge the horse became uncontrollable, and while so plunged into the chasm in the highway.   The jury, by answer to the third question, found that the horse was beyond control at and immediately prior to the time intestate drove into the river.   This necessarily must be understood as adopting the plaintiff's theory.   That being assumed, the defendant insists that there is no evidence to support the answer to the fourth question, that such loss of control was only momentary.   This theory of the driver's loss of control of the horse rests upon the testimony of two witnesses to the effect that, as he passed an electric motor car at a point approximately ninety feet from the bridge, the horse was frightened, shied, and from that point ran or galloped uncontrolled along the street to and into the river.   There is no other evidence whatever of any loss of control, or any change in the conduct or pace of the horse, from a point at least two or three hundred feet away.   Thus is presented the question whether a horse can, by any reasonable possibility, be said to be only momentarily uncontrolled while running a distance of eighty or ninety feet along a highway, in the sense in which that expression is used in the law laid down on the subject of liability of municipalities for defects in their highways.

The rule was early established in Massachusetts and Maine that such liability of municipalities is special and statutory; that only where the defect in the highway is the sole, proxi-

mate cause of the injury is such liability imposed, and that if there concurs therewith another proximate cause, for which the municipality is not responsible, there is no liability; and that the running away of a horse is such independent cause, unless itself produced by fault of the town. The principle is also otherwise stated that by the statute municipalities are only made liable to those using the highway in the ordinary manner for purposes of travel, and that a runaway team is not within that use. Wisconsin, whose highway statutes were taken from Massachusetts, early adopted, also, this construction of what is now sec. 1339, Stats. 1898, and has persistently adhered thereto. *Jackson v. Bellevieu,* 30 Wis. 250; *Schillinger v. Verona,* 96 Wis. 456, 71 N. W. 888; *Ritger v. Milwaukee,* 99 Wis. 190, 74 N. W. 815; *McFarlane v. Sullivan,* 99 Wis. 361, 74 N. W. 559, 75 N. W. 71; *Johnson v. Superior,* 103 Wis. 66, 78 N. W. 1100; *Titus v. Northbridge,* 97 Mass. 258; *Higgins v. Boston,* 148 Mass. 484, 20 N. E. 105. The courts of both states have, however, recognized what may be called an exception to the foregoing rule, in that one driving the streets in the ordinary manner may be subjected to peril by a defect, such as a declivity or lack of railing, by a sudden or spasmodic movement of the horse, usually a shying or falling, causing immediate contact with the defect, provided the failure of the driver to control the horse is only momentary. *Houfe v. Fulton,* 29 Wis. 296; *Olson v. Chippewa Falls,* 71 Wis. 558, 37 N. W. 575; *Schillinger v. Verona, supra; Ritger v. Milwaukee, supra; Wright v. Templeton,* 132 Mass. 49, 51; *Hinckley v. Somerset,* 145 Mass. 326, 332. 14 N. E. 166; *Scannal v. Cambridge,* 163 Mass. 91, 39 N. E. 790. Generally such cases as sustain the exception relate to a sudden swerving or shying of the horse—one of them, at least, to a sudden sickness, staggering, and falling, and two of them to a sudden backing up from fright. In all, however, great insistence is placed upon the idea that the injury must so accompany the sudden,

spasmodic, and unexpected movement of the horse that the failure to control is but momentary, in the strictest sense of that word. Indeed, this phrase has sometimes been adopted to express the idea: "If a horse . . . merely shies or swerves, . . . so that the driver does not in reality lose control over him." Elliott, Roads & Streets, § 615. Generally it may be said that the event sought to be described is wholly inconsistent with a condition where a horse is moving along the road in the course of a struggle for mastery. It is substantially limited to those spasmodic movements which often occur while the horse is generally within the control of his driver, but where the particular movement is so quick and unexpected that it and its results take place before efforts to control can be exerted. Unfortunately most words are in some degree elastic and are used with variant meaning under differing circumstances, and the word "momentary" is no exception. It is apparent from the judge's charge, not excepted to, that his conception of the idea was merely the antithesis to "permanent." Within the definition given in that charge, any period of struggle between a frightened horse and his driver would be momentary until he became a runaway, completely escaped from the driver's mastery, as an established and permanent condition. Obviously such a moment might permit a run along a highway for a long distance, the driver unable to stop or guide the horse, and yet struggling to do so, with prospect of ultimate success. It is not to be denied that such a conception can be gained from definitions of "momentary loss of control" found in some of the cases above cited, but examination of the events as to which courts were speaking will negative any such meaning. Such cases illustrate the futility of attempting any definition of such a word as "momentary," which alone and undefined is likely to convey a more accurate idea than any substitutionary phrase. It is particularly incorrect to use the word as merely antithetic to "perma-

nent," so as to convey the idea that until the horse has become a runaway, as a permanent condition, he may still be deemed only momentarily uncontrolled. This is to give to the word "momentary" the meaning of "temporary." It is true, as respondent urges, though only within some limits, that the momentary character of the uncontrolled movement of the horse is not necessarily decided by the distance he moves. It is doubtless impossible to say how far a frightened horse may spring before his driver can bring to bear efforts to control him. Nevertheless there is a limit within human experience beyond which such movement cannot possibly go. Thus in *Olson v. Chippewa Falls,* 71 Wis. 558, 37 N. W. 575, and *Hinckley v. Somerset,* 145 Mass. 326, 14 N. E. 166, the courts refused to hold, as matter of law, that a frightened horse might not momentarily reach a defect twenty feet away. In the latter case, however, it was said that sixty feet was beyond any such possibility, the horse's movement being backward. In the following cases a forward movement over the specified distances was held more than momentary, though not entirely because of the distance traveled: Sixty-five or seventy feet (*Titus v. Northbridge,* 97 Mass. 258); forty-six feet (*Ritger v. Milwaukee,* 99 Wis. 190, 74 N. W. 815); seventeen feet (*Scannal v. Cambridge,* 163 Mass. 91, 39 N. E. 790).

In the present case the horse first shied to one side, and then started forward in a gallop. According to plaintiff's witnesses, the deceased practically at once pulled back on the lines so that the traces were loosened, and the horse traveled at least sixty or seventy feet drawing the vehicle by the bit, and resisting the efforts to stop his forward movement. It cannot be doubted that when the horse recovered from his swerve, and started upon a forward course in resistance to the efforts to stop him, the momentary escape from control contemplated by this rule of law was over. Thenceforward he was a runaway horse, and that, too, wholly without re-

gard to whether ultimately he could have been stopped by his driver. The travel along a street for sixty, seventy, or eighty feet after a fright we must hold, as matter of law, is wholly inconsistent with momentary absence of control, as the expression is used in the rule of law permitting liability of a municipality for injuries so occurring.

The views thus declared result, of course, in the conclusion that the fourth question should have been answered "Yes," and that the trial court erred in denying appellant's motion to strike out the negative and insert an affirmative answer. That conclusion being reached, and no reason appearing why a new trial is necessary, our duty is to order done that which ought to have been done, namely, to make the change and render judgment accordingly. This decision renders unnecessary consideration of certain other errors assigned by appellant.

*By the Court.*—Judgment reversed, and cause remanded with directions to grant defendant's motion to amend the special verdict by changing the answer to the fourth question therein from "No" to "Yes," and, upon the verdict as so amended, to render judgment for the defendant.