## 8922.   CORLEY v. COBB COUNTY.

</div>

Where a horse approaching a county bridge becomes frightened for some unexplained reason apart from any defect in the construction of the bridge or its abutment, and escapes from the control of its driver, and, running away rapidly and violently, is crossing the bridge, when a bystander intercepts him on the bridge, and, by an effort to stop the

flight of the animal, causes it to swerve or wheel suddenly to one side, and, in consequence, horse, buggy, and driver are precipitated from the bridge to the water below, the county.is not liable, notwithstanding the bridge is unprotected by barriers, as the proximate cause of the accident is the ungovernable nature of the runaway horse and the abortive efforts of the bystander to stop it. The court did not err in granting a nonsuit.

DECIDED NOVEMBER 2, 1917.

Action for damages; from Cobb superior court—Judge Searcy presiding. April 24, 1917.

*J. Glenn Giles, J. Z. Foster,* for plaintiff.

*E. H. Clay, D. W. Blair,* for defendant.

WADE, C. J.   J. T. Corley brought suit against Cobb county, seeking damages for personal injuries to his wife, and alleged, in brief, that on May 26, 1914, while his wife was driving a horse attached to a buggy, from her home on the Powder Springs road, a public highway, to Marietta, Georgia, and while descending a long hill commonly known as "Goodman Hill," at a point about midway thereof and about 150 yards south of the public bridge which spans the "two-mile branch," the horse, from a cause unknown to the driver, suddenly became frightened, ran down the hill, and continued his flight on to the bridge; that when the horse had nearly reached the main span of the bridge and was upon the south abutment thereof running at great speed and beyond the control of the plaintiff's wife, T. W. Robertson, a mail-carrier, who was standing on the west end of the abutment on the south side of the bridge, vehemently and violently gesticulated at and towards the horse, whereupon it suddenly swerved to the right, causing the horse, buggy, and driver to be thrown off the abutment, a distance of nine feet, to the water below. The plaintiff alleged negligence on the part of the county in not having the bridge or abutment properly protected by guard-rails, banisters, railing, or other means of protection, and insisted that this negligence was the proximate cause of the injuries received by his wife. At the conclusion of the evidence introduced in behalf of the plaintiff, the court granted a nonsuit, and to this ruling, as well as to several rulings of the court in rejecting certain proffered testimony, the plaintiff excepts.

It will be observed that the plaintiff's cause of action is grounded solely upon the proposition that the defendant was negligent in not having its bridge properly protected by guard-rails

or other means of protection, and that this negligence was the direct, proximate cause of the injuries sustained by his wife. Without entering into any lengthy dissertation on the subject of proximate cause, it is enough to say that whether the negligence of the county (if it was guilty of any negligence at all) was the proximate cause of the injuries would generally be a question for the jury; but where all the evidence in behalf of the plaintiff clearly shows that the injuries complained of were not the natural or proximate result of the defendant's conduct, negligence, or breach of duty, but resulted through an independent agency or agencies, not invoked or brought into play by the defendant, no recovery would be authorized on this ground.

As we view this case, the alleged negligence on the part of the defendant in failing to properly protect the bridge with guardrails or banisters was not the proximate cause of the injuries sustained; but, to the contrary, said injuries were the natural and proximate result of two independent causes, not in any way related to the alleged negligence of the defendant. The two causes which brought about the injuries complained of were: (1) the wild, ungovernable conduct of the horse in its mad flight down the hill; and (2) the acts of one Robertson in trying to stop the runaway animal, which caused it to swerve or wheel sharply to one side and off the bridge; the former being, in our opinion, the primary cause, and the latter the secondary, contributing cause, and the two causes, considered together, being the direct, proximate cause of the injuries for which damages are now sought. Without either of these causes the catastrophe would not have occurred. Had the horse been under the control of its driver, they would have passed over the small stream in entire safety—either by way of the ford or over the bridge. So, too, notwithstanding that the horse was running away and entirely beyond the control of its driver, they would nevertheless have passed over the bridge in safety but for the acts of Robertson in vehemently and violently gesticulating at and towards the then wild and unmanageable animal. As to the nature and conduct of the horse (the primary cause) just prior to and at the time of the injury, the uncontradicted evidence of the driver thereof is: "I was going down that long hill the other side of the branch, and all of a sudden the horse became frightened at something, I don't know what. I

wasn't noticing him particularly and did not see anything for him to get frightened at. I was just driving along singing. When he [the horse] became frightened he began to run, and continued to run, and got faster and faster. He started pretty fast. He began to run half way up that long hill. . . If I could have controlled my horse when I got down there I had two ways of crossing the branch,—either drive through the branch below the bridge, or drive over the bridge. I could not control my horse, he was entirely beyond my control. I could not control him at all, although I did make the effort to control him and turn him. I put all my strength against him and it made no impression on him at all." It will be observed, from the testimony of this witness, that the horse, which she was attempting to drive, "was entirely beyond her control," and that had the animal been manageable she could at her pleasure have crossed the stream, either by driving through the branch below the bridge or over the bridge. It is obvious, therefore, that since the horse was "entirely beyond the control" of its driver, she was prevented from exercising reasonable care or any degree of prudence whatever. The accidental fall of the horse and buggy in which she was riding was a personal misfortune, the direct consequences of which must be borne by the plaintiff. County authorities do not owe the general traveling public any duty to make their highways safe for unmanageable runaway horses. If this were not so, county authorities would be required to exercise extraordinary, rather than ordinary, care to prevent injuries on their highways or public roads. The duty of the county is to exercise ordinary care to make its public roads reasonably safe for reasonably safe road animals. In other words, the defendant's duty was simply to provide for the usual and ordinary risks of travel. In *Stamps* v. *Newton County*, 8 *Ga. App.* 229 (68 S. E. 947), it is held: "It is the duty of the proper county authorities to construct and maintain bridges across streams in a workmanlike and proper manner, so that any person may use them with safety, in ordinary travel, but this duty is not one of extraordinary care and diligence, nor does its exercise extend to extraordinary occasions, beyond the ken of general experience. The law does not make the county authorities insurers of the safety of any of those who use bridges." In 37 Cyc. 292, it is said: "A lack of railing commonly gives no right of

action to the owner of a horse running away or beyond the control of the driver." In Thubron v. Dravo Contracting Co., 238 Pa. St. 443 (86 Atl. 292, 44 L. R. A. (N. S.) 699, Ann. Cas. 1914C, 252), the Pennsylvania Supreme Court said: "We have uniformly held that dangers which a runaway horse may encounter in his erratic course are not such as the municipality is bound to provide against; its duty in this respect being measured alone by reasonable regard for the safety of the ordinary traveler, himself exercising reasonable care and prudence. Whenever in any of our cases a municipality has been held liable for damages resulting through a frightened horse, it has appeared as a fact that the horse took fright at a point on the highway where it was in unsafe condition, and the disaster followed as an immediate consequence. There is a clear distinction between cases of this character and cases like the one we are now dealing with, and nowhere is this distinction more clearly recognized and explained than in Schaeffer v. Jackson Tp. [150 Pa. St. 145, 24 Atl. 629, 18 L. R. A. 100, 30 Am. St. R. 792]. Heydrick, J., delivering the opinion there says: 'It is a general rule as well settled as anything in the law of negligence that a man is responsible for such consequences of his fault as are natural or probable, and might therefore be seen by ordinary forecast, but if his fault happens to concur with something extraordinary, and therefore not likely to be foreseen, he will not be answerable for the extraordinary result." Again in Ehleiter v. City of Milwaukee, 121 Wis. 85 (98 N. W. 934, 66 L. R. A. 915, 105 Am. St. R. 1027, 2 Ann. Cas. 178), it was held: "The rule was clearly established in Massachusetts and Maine that such liability of municipalities is special and statutory; that only where the defect in the highway is the sole, proximate cause of the injury is such liability imposed, and that if there concurs therewith another proximate cause, for which the municipality is not responsible, there is no liabilty, and that the running away of a horse is such independent cause, unless itself produced by fault of the town. The principle is also otherwise stated that by the statute municipalities are only made liable to those using the highway in the ordinary manner for purposes of travel, and that a runaway team is not within the use." See also Kingsley v. Bloomingdale Tp., 109 Mich. 340 (67 N. W. 333); Glasier v. Hebron,

131 N. Y. 447 (30 N. E. 239); Waller *v.* Hebron, 5 App. Div. 577 (39 N. Y. Supp. 381); Lane *v.* Wheeler, 35 Hun (N. Y.), 606.

As to the acts of Robertson in trying to stop the runaway horse (the secondary contributing cause), the driver thereof testified: "At the time this injury occurred, had not Mr. Robertson interfered with my horse, I don't think my buggy would have run off of that abutment. I had a clear way over the bridge, because Mr. Robertson was over on the other side; over on the west side, and my horse was coming straight down the road. Had the horse kept straight in the track the way he was going, without swerving, he certainly would have gone across, for the way was open across that bridge. At the time the wheel ran off, the horse seemed to me to be flying. I don't know how far off of the abutment the wheel went. . . The horse turned to the right as he approached Mr. Robertson and as he was passing him he swerved right around that away, that was to my right. . . I was coming towards town and the horse swerved to my right naturally because Mr. Robertson was on the other side you see, and he swerved around to get out of the way of him. . . When I saw Mr. Robertson gesticulating at my horse, I knew the horse would swerve around, and knew that the embankment was there, and that was the reason I made the effort to keep the horse from swerving around Mr. Robertson. . . I don't think when I used my left hand to motion to Mr. Robertson, that I then let that line slack so that I would be pulling more on the right-hand line than I was on the left-hand line. I don't know about that. I just had both of them in my hands, you know, and motioned him, and it was all done so quickly. I had no control over the horse at all; it wasn't paying any attention to me."

From the testimony hereinbefore set forth, it is evident that the escape of the horse from the control of the party in charge, and the efforts of Robertson to stop the flight of the horse, constituted the efficient, direct, and proximate cause of the injuries complained of, for which no responsibility rested on the defendant. Or to state it differently, the blind violence of the animal, acting without guidance or direction, became, in the course and order of incidents which ensued, the controlling and proximate cause of the injuries inflicted by the fall from the bridge. The court therefore did not err in granting a nonsuit.

None of the Georgia cases cited by able counsel for the plaintiff

in error are in conflict with anything here decided, since in those cases which dealt with injuries on abutments or bridges without banisters, resulting from fright, the animal has taken fright *on the bridge or abutment,* or the construction of the bridge or its abutment caused the fright, and the injury followed as an immediate consequence of the fright at the place alleged to be defective.

The plaintiff in error insists, in two other exceptions, that the court erred in rejecting certain proffered testimony. In disposing of these exceptions we do not deem it necessary to do more than say that had this testimony been admitted, it would not have so materially aided the plaintiff's case as to change our affirmance of the nonsuit; and therefore, if the refusal of the court to admit it was error at all, the error was harmless.

*Judgment affirmed. Jenkins and Luke, JJ., concur.*