### 48328, 48329. McDANIEL v. SOUTHERN RAILWAY COMPANY et al.; and vice versa.

PANNELL, Judge. 1. "While a county is not liable to suit unless made so by statute, it has been provided by a statute of this State that a county is primarily liable for all injuries caused by reason of any defective bridges, whether erected by contractors or county authorities; . . ." *Berrien County v. Vickers,* 73 Ga. App.

863 (1) (38 SE2d 619); *Stone v. McMeekin Construction Co.,* 110 Ga. App. 546 (8) (139 SE2d 421); Code § 95-1001.

2. Under Code § 95-1001, a bridge includes the structure of the bridge itself, its approaches (here 100 feet from the end of the bridge structure, as the bridge was 700 to 1,000 feet long) abutments and appurtenances necessary to its proper use (*Berrien County v. Vickers,* 73 Ga. App. 863 (1), supra; *Mitchell County v. Dixon,* 20 Ga. App. 21 (3) (92 SE 405); *Hagan Grocery Co. v. Nobles,* 26 Ga. App. 394 (2) (106 SE 807)), and the diligence required by the county is applicable to all portions of the bridge as so defined. *Morgan County v. Glass,* 139 Ga. 415 (4) (77 SE 583). The guardrails here, although not actually attached to the bridge, are nothing more than an extension of the bridge rails and designed to prevent or mitigate the causes of collision with the bridge structure itself, as well as to prevent running off the approach embankment. It follows, therefore, that the duty to exercise ordinary care to build and maintain the bridge in a safe condition applies to the guardrails in the present case.

3. However, the duty to do so applies only to those using the approaches and the bridge structure for ordinary travel. *Grady County v. Banker,* 81 Ga. App. 701 (6) (59 SE2d 732); *Collier v. Cobb County,* 81 Ga. App. 712 (59 SE2d 672); *Meriwether County v. Gilbert,* 42 Ga. App. 500 (156 SE 472). Ordinary travel, however, is not synonymous with ordinary care.

4. Where a metal guardrail on posts is placed on the approach to a bridge on an expressway, or Interstate Highway, which guardrail was designed, built and installed by the State Highway Department (now, Department of Transportation), and at the time of its design was a standard design and approved by Federal Road Authorities, and which curved away from the concrete pavement as it extended from the end of the bridge rail for a distance of 80 feet and terminated above ground four feet from the edge of the concrete pavement, with the metal rail bent slightly outward, and known as a beam and guardrail and which did not disappear into the ground as a newer design known as a flaired and anchored guardrail, which became a standard design after the bridge and guardrail were designed, but before the contract was let and they were built, the county is not liable to a passenger in an automobile who was injured and killed when the automobile driven by a fellow employee on a straight section of road approaching the bridge ran off the left edge of the pavement when the driver fell asleep and remained entirely or

partly off the left edge of the payment for a distance of 132 feet before hitting the end of the guardrail, which pierced the automobile on the passenger's side striking the passenger, and the automobile, after ripping up half of the guardrail and posts, went down the embankment reversing its direction of travel. The county in which the bridge was built and maintained was not liable for the death of the passenger under Code § 95-1001 for the reason the sole proximate cause of the collision, which resulted in the injuries to the passenger, was the act of the driver of the automobile. See *Hancock County v. Clark,* 46 Ga. App. 363 (167 SE 748) where an automobile hit a soft spot in the road, not a part of the approach to the bridge, causing the driver to lose control and hit an abutment to the bridge and causing injuries to a passenger. See also *Corley v. Cobb County,* 21 Ga. App. 219 (93 SE 1015); *Smith v. Colquitt County,* 37 Ga. App. 222 (2) (139 SE 682); *Eberhart v. Seaboard Air Line R. Co.,* 34 Ga. App. 49, 55 (129 SE 2); *Scott v. Edwards,* 50 Ga. App. 373 (178 SE 175); and *Knight v. Floyd County,* 38 Ga. App. 515 (144 SE 348) in which it was held: "The mere fact that a bridge, at its entrance on a highway, is narrower than the road, and that by reason of this discrepancy in width a vehicular traveler approaching the bridge and adhering to the outer edge of the road will fail to take the bridge and will fall from the road into a declivity on the side of the road at the entrance to the bridge, constitutes no defect in the bridge itself or in the abutments to the bridge, or in the manner in which the bridge is connected with the highway." It is not a duty of the county to anticipate and provide against a driver of an automobile falling asleep, but this falls within the "domain of the unusual and extraordinary, and therefore, in contemplation of law, of the unforeseeable," there being no defect in the bridge which was a contributory cause toward rendering the automobile uncontrollable. *Georgia Power Co. v. Murray,* 57 Ga. App. 141, 148 (194 SE 403).

5. The trial court did not err in granting the county's motion for summary judgment as against the plaintiff.

*Judgment affirmed. Eberhardt, P. J., and Stolz, J., concur.*

ARGUED JUNE 28, 1973 — DECIDED NOVEMBER 8, 1973 — REHEARING DENIED NOVEMBER 28, 1973 —

*J. M. Grubbs, Jr., Adele Platt,* for appellant.

*Greene, Buckley, DeRieux & Jones, Burt DeRieux, Alfred B. Adams, III, Arthur K. Bolton, Attorney General, Marion O. Gordon,*

*G. Thomas Davis, Assistant Attorneys General, G. Conley Ingram, Deputy Assistant Attorney General,* for appellees.

These cases are before this court on appeal from the sustaining of a motion for summary judgment by the defendant, Bibb County, Georgia. An action was commenced in the Superior Court of Cobb County, wherein, as amended, plaintiff seeks to recover damages for the full value of her husband's life and his funeral expenses against Bibb County, John M. Overton and Southern Railway Company. This action is brought on the grounds of negligence on the part of all the defendants, and against Southern Railway Company under the Federal Employers' Liability Act. Bibb County answered and filed a motion to dismiss the complaint on various grounds, two of which were related to venue. These two grounds were ruled upon by the trial judge and denied. On appeal, this ruling was affirmed. *Bibb County v. McDaniel,* 127 Ga. App. 129 (192 SE2d 544). Cross appeals against each other were filed by Bibb County and Southern Railway Company. Bibb County then filed its motion for summary judgment as against the plaintiff, which was sustained. Plaintiff and Southern Railway Company entered separate appeals.

The alleged negligence against Bibb County was that it installed and maintained a guardrail on an approach to a bridge over a creek on Interstate Highway No. 475, which was negligently designed and negligently maintained, in that the end of it paralleling the highway "stuck up and protruded up" not being anchored in the ground and in such a manner as to present the end extremity of said guardrail as a hazardous and dangerous penetrating object should it be struck by any moving vehicle; and that the proximate cause of decedent's death was the penetration by this rail of the vehicle in which decedent was riding as a passenger, causing or contributing to the cause of his death.

The evidence produced on the motion for summary judgment showed substantially the following facts or, construed most strongly against movant, authorized a finding to that effect.

Plaintiff's deceased husband and the defendant, John M. Overton, were both employees of Southern Railway Company, traveling from Marietta, Georgia to Jacksonville, Florida on March 17, 1971, in the course of their employment, in a 1969 4-door station wagon. The automobile belonged to the defendant, Southern Railway Company, and so far as the driver knew, there was nothing wrong with it. As they headed southbound on Interstate Highway No. 475, approaching the Tobesofkee Creek

bridge, the defendant, John M. Overton, was driving and the plaintiff's decedent, Richard McDaniel, was a passenger in the right front seat. The automobile had been traveling at a speed between 60 and 70 miles per hour. At a point approximately 132 feet from the end of the guardrail, which extended a distance of approximately 80 feet from the bridge, the automobile left the concrete portion of the road and ran along the shoulder before hitting the end of the guardrail. The guardrail penetrated the automobile from the front right headlight through the back window, exiting out the window and killing the deceased in the process. The automobile landed, headed in a northerly direction with the front of the automobile 50 feet from the point of impact and 24 feet from the edge of the road, with the guardrail lying 22 feet southerly from the automobile. One whole section of the guardrail (built into 42 foot sections) was demolished and the end of the next section pushed in. The driver, after the collision, stated that he obviously was asleep and that he did not remember leaving the concrete portion of the highway but remembered seeing the guardrail just before striking it. He testified to substantially the same thing. He did not have time to put on brakes. There was no sign of brake marks.

The guardrails involved in the present case were constructed of galvanized guardrail panels attached to eye beam steel posts, designed by the State Highway Department (now the Department of Transportation), and approved by the U. S. Bureau of Public Roads (now the Federal Highway Administration). The end of the horizontal portion of the guardrail was in a shape like a parabolic sector and deflected or curved away from the road 9 inches minimum in 14 and 3/4 inches. The standards by which it was designed were the appropriate standards to use for design and construction when Interstate Highway No. 475 was designed, being Standards Nos. 4034, 4032A and 4033A. The positioning of the guardrail was used to mitigate the hazard of vehicles hitting the bridge posts. The guardrail extended from a point a few inches from the bridge post and outward from the roadway and at its terminal point was 4 feet from the concrete roadway at a point where the shoulder of the road ended and the embankment downward began. The standards for the guardrail in question were established in 1959, and the first part of 1960. The contract for the guardrail was let on March 20, 1964, and it was constructed August 31, 1966.

Dr. Jerome William Hall, who was qualified as an expert,

testified by deposition as follows: Deponent says that he has examined copies of Georgia Standards 4034, 4032A, and 4033A of the Georgia State Highway Department (now known as the Georgia Department of Transportation). Deponent says that, from his background and experience, he is familiar with the type of guardrail terminal shown in these standards. The end of such a guardrail is shaped like a parabolic sector and is slightly deflected away from the roadway. Deponent says that he has conducted considerable study into the question of safety standards for guardrails and particularly the terminal end of such guardrails with respect to the consequences of a collision of a moving motor vehicle with the terminal section of the guardrail. Deponent says that a particular hazard posed by terminal sections of guardrails is penetration of a moving motor vehicle. If the guardrail terminal is not flared away from the highway and anchored by bending the ends backwards and downwards and fixing them in concrete, but instead simply has a parabolic sector end to it like that shown in the Georgia Standards, a vehicle, if it strikes the end of the guardrail, may be penetrated by the terminal section of the guardrail in such a manner as to enter the automobile through the engine or windshield area and strike occupants in the car. On the other hand, flared and anchored guardrails, which may be designed so as to develop full tensile strength (the ability to withstand collisions with vehicles), do not pose this danger inasmuch as there is no terminal section of the guardrail protruding to pierce the motor vehicle. Instead the guardrail terminal on the flared and anchored guardrail will usually cause the automobile to be deflected in one direction or another without the hazard of penetration by the guardrail.

Deponent says that he is familiar with the practices of the United States Bureau of Public Roads (now known as the Federal Highway Administration), the Highway Research Board, the American Association of State Highway Officials, the Eno Foundation for Highway Traffic Control, Inc., and the National Cooperative Highway Research Program of the Highway Research Board, as these organizations and sub-organizations are involved in the study, investigation, publication and dissemination of data, research results and opinions relating to highway safety, including the safe design and construction of guardrails and their terminals. The following publications are, in deponent's opinion, authoritative on the subject of proper and improper design and construction of guardrail terminals and a State Highway

Department should, in deponent's opinion, have access to and make use of these publications, memoranda, etc., in connection with the design and construction of guardrails and guardrail terminals. (Then follows the list.)

Deponent further says that a guardrail abutting a bridge on an interstate highway which was constructed in August, 1966, should, in deponent's opinion, have been constructed so as to include the flared and anchored type terminal, as illustrated in the diagram attached hereto and incorporated herein as Exhibit "A" instead of the unanchored, protruding guardrail with the end consisting of a parabolic sector. This opinion is based on deponent's experience and knowledge regarding guardrail design and construction and on deponent's knowledge of the type of guardrail terminals designed and being put into use at that time in some locations. Deponent further says, in his opinion, that if a State Highway Department did issue a standard using the parabolic sector and an unburied terminal on a guardrail and thereafter revised its standards to include incorporation of the flared and anchored guardrail terminal, considerations of safety for the motoring public as well as economic reality would permit the modification of the parabolic sector guardrail terminal to a flared and anchored guardrail terminal. Deponent says that this would be his opinion with respect to a guardrail terminal constructed in August, 1966, and in continuous use as a parabolic sector guardrail terminal until March 17, 1971. Deponent states that, in his opinion, it became more and more common and a better and better roadside safety practice to remove old style parabolic sector terminal guardrails and replace them with flared and anchored guardrail terminals in the four and one half years between August, 1966, and March, 1971. Deponent states that in his opinion modification of the guardrail terminals on a double bridge (one bridge each for highway traffic flowing in opposite directions) on an Interstate highway to remove the parabolic sector terminal of the guardrails on said bridge approaches and install the safer flared and anchored type terminals would cost a maximum of $1,500.00 for both bridges. The deponent is familiar with published data which indicates the high safety benefit/cost ratio for correctly installed protective guardrail.

In sum, it is deponent's opinion that the existence in March, 1971, of a parabolic sector on the terminal of a guardrail on an interstate highway in Georgia, or any other state, where said guardrail had been constructed in August, 1966, and had been in

an unchanged and unmodified condition until March, 1971, was a dangerous and unwarranted roadside condition until March, 1971, was a dangerous and unwarranted roadside condition, hazardous to motorists and not in conformance with policy and standards established in the highway construction industry for construction and/or correction or modification of parabolic sector terminals of guardrails to flared and anchored terminals and guardrails.